**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. CA 02-154 ML** |
| **CHARLES W. SULLIVAN,** | ) | |
| **Defendant.** | ) | |

**THE SEC'S REPLY**
**IN SUPPORT OF ITS MOTIONS *IN LIMINE***

The Securities and Exchange Commission ("SEC") hereby submits its reply to the Defendant's opposition to the SEC's motions *in limine*. By this reply, the SEC seeks to correct certain statements made in the Defendant's opposition.

## I. The Defendant Defends Exhibits and Evidence that Are Not the Subject of the SEC's Motions in Limine.

As a primary matter, the SEC notes that in the Defendant's opposition, the Defendant unnecessarily defends the introduction of certain documents that are not the subject to the SEC's motions *in limine*:

Exhibit Q-S (Boston Herald drawing of Chuck Sullivan from the New England Patriots Family Album dated October 1981);

Exhibit S-S (Complaint in Rheaume Holdings, LTD. v. Raymond James Financial Services, Inc., et al dated September 12, 2002 CA 02. 400 ML);

Exhibit AI-S (Commission from dated June 6, 1964 appointing Defendant as Second Lieutenant in the U.S. Army);

Exhibit AJ-S (Department of the Army Certificate dated July 14, 1969 awarding Army Commendation Medal);

Exhibit AK-S (Statement of General David E. Ott dated July 14, 1969); and

Exhibit AL-S (Program for Super Bowl I).

The SEC has notified the Defendant of its objections to these documents and reserves the right to press the objections depending on the manner in which the Defendant intends to introduce them at trial. These documents are not, however, at issue in the SEC's motions.

In addition, the Defendant goes to great lengths to defend introduction of evidence regarding $200,000 paid to Bloushi on August 30, 2000. However, the SEC has not sought to exclude evidence of that payment either. In its initial motion, the SEC sought to exclude, on the issue of liability, "1) settlements of private actions brought by investors and 2) payments made to investors as a result of the SEC's administrative action against [RJFS]." More specifically, as spelled out in its initial motion, the SEC sought to exclude, on the issue of liability, evidence of settlements of private actions by Four Star and Fitzhenry and evidence of payments likely to be made to Fitzhenry as a result of the RJFS administrative proceeding. The SEC has not sought to exclude any evidence relating to payments made to Bloushi.

While the SEC does not seeks to exclude evidence of these payments, the SEC vigorously contests the Defendant's suggestion that it was the Defendant who paid the $200,000 to Bloushi and that it had any relationship whatsoever to the $300,000 he received from Brite Business on June 28, 2000. *See* Defendant's Opposition, at 5. The Defendant claims that *he* sent the $200,000 by wire transfer to Bloushi, but the record reflects that the payment was made by Mary Lee Capalbo from her special client account

at RJFS. *See* Trial Exhibit 232 (Transfer request dated 8/30/00 from Capalbo to RJFS w/ Ullom approval signature (SEC- 56I 1085)) (attached hereto as Exhibit A.) The Defendant also now suggests that this transfer constituted a substantial repayment of the loan to him, when he has already admitted under oath that he has not paid the loan back. *See* Defendant's Opposition, at 5,6; Excerpt of Transcript of Deposition Testimony of Charles Sullivan dated July 1, 2003, at 239 (Exhibit B).

## II. <u>The SEC's Proposed Disgorgement Figures Account for the Post-Scheme Payments.</u>

In his opposition, the Defendant repeatedly suggests that the SEC is attempting to "hide" evidence of post-scheme payments made to investors. That is simply not the case. As the SEC stated in its motion, the SEC proposed disgorgement figures give the Defendant credit for amounts that he and other Brite Business principals returned to wronged investors, for amounts paid in private settlements, and for amounts paid as a result of the SEC's enforcement action against RJFS. However, these post-scheme payments made after the violations have no bearing on whether the violations occurred in the first place. They do not invalidate his claim and thus, should not be submitted to the jury on the issue of liability. While the Defendant repeatedly suggests, in conclusory terms, that these payments are "certainly probative" of whether a violation was committed, he has not presented and cannot present any legal authority or practical support for that proposition.

## III. <u>The Defendant Should Not Be Allowed to Argue Legal Issues to the Jury.</u>

Finally, the Defendant hopes to be able to argue his incorrect interpretation of legal issues, presented out of context and in a vacuum, to the jury and to have the jury credit this faulty interpretation in rendering its decision. More specifically, the Defendant has seized upon a single line taken from the decision in the separate RJFS proceeding, which did not involve the Defendant, and hopes to get the jury to analogize the finding made there to his own, completely different situation. In a footnote and without explanation, the judge in the RJFS matter stated, "Raymond James cannot be held liable for Mr. Herula's actions with respect to Mr. Al Bloushi because Mr. Al Bloushi did not rely on representations by Mr. Herula in making his investment in Brite Business." *See In re RJFS, et al.* , S.E.C. Rel. No. ID-296, 2005 WL 2237628, at *58 n.75 (Sept. 15, 2005).

As a primary matter, this finding does not relate in any way to the Defendant, who was not participant in that proceeding. Further, the legal proposition that the Defendant hopes to assert through this statement is simply wrong. As <u>the First Circuit</u> has held in connection with its review of <u>this matter</u> before the Court, the SEC <u>does not</u> need to prove that any of the victims actually relied upon the alleged misrepresentations or omissions in order to establish liability. *See SEC v. Fife*, 311 F.3d 1, 9 (1st Cir. 2002); *see also SEC v. Credit Bancorp*, 195 F.Supp.2d 475, 491 (S.D.N.Y. 2002) (citing cases with respect to reliance). Rather, as the SEC has repeated stated, in order to establish liability, it needs to show three things: 1) that a securities law violation was committed; 2) that the Defendant was generally aware of the primary violation; and 3) that the Defendant rendered substantial assistance to the primary violation. *Cleary v. Perfectune,*

*Inc.*, 700 F.2d 774, 777 (1st Cir. 1983), *overruled on other grounds by Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994); *SEC v. Peretz*, 317 F. Supp.2d 58, 63 (D. Mass. 2004). By presenting evidence of the Defendant's help in the solicitation of funds, his distribution funds to third parties, his misappropriation of funds for himself, and his dozens of misrepresentations designed to lull investors into thinking that their money was safe, the SEC intends to satisfy this burden.[1]

In short, the Defendant should not be allowed to confuse the jury with his misleading interpretation of legal issues. Rather, the jury should be limited to considering facts, not law, so that it can make an appropriate factual determination as to whether the Defendant engaged in the conduct alleged.

Accordingly, for the foregoing reasons, the SEC respectfully requests that the Court grant its motions *in limine*.

[1] *See, e.g., Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) (finding that broker provided substantial assistance to adviser's fraud where his sole contribution was reassuring client that adviser was competent in executing trades), *op. amended*, NO. 77-7104, 77-7124, 1978 WL 4098 (May 22, 1978); *Lazzaro v. Manber*, 701 F. Supp. 353, 569 (E.D.N.Y. 1988) (statements to investors by broker about initial offering when broker should have known statements not supported by financials deemed substantial assistance to fraudulent offering); *SEC v. Holschuh*, 694 F. 2d 130, 144 (7th Cir. 1982) (holding that defendant's post-sale activities, which were part of a single scheme, were actionable); *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983) (holding that post-sale lulling activities would be actionable); *see also United States v. Rude*, 88 F.3d 1538, 1544 (9th Cir. 1996) (noting that post-purchase conduct "extended the overall scheme by lulling the victims into a false sense of security, postponing their ultimate complaint to the authorities, and therefore making the apprehension of the defendants less likely than if no [such conduct] had taken place") (internal quotation marks and citations omitted).

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION,

By its attorneys,

Luke T. Cadigan (Mass. Bar. No. 561117)
Senior Trial Counsel
Bradford E. Ali (Mass. Bar No. 649541)
Senior Counsel
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110
Tel. No. (617) 573-8919 (Cadigan)
Fax No. (617) 573-4590

Dated: July 25, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2006, I caused copies of the foregoing Motion in Limine to be served on each of the defendants at the addresses indicated below and by the methods indicated for each:

Defendant Charles W. Sullivan (Pro Se)
675 Third Avenue
New York, NY 10017
(By Fax and First-Class Mail)

Defendant Farouk A. Khan (Pro Se)
224 Hockenberry Road
Hillsboro, NJ 08844
(By First-Class Mail)

Luke T. Cadigan

**Mary Lee Capalbo**
**Attorney at Law**
**17 Lippitt Avenue**
**Warwick, RI 02889**
**Pho: (401) 742-7420.Fax: (401) 780-9959**

August 30, 2000

Raymond James Financial Services
150 Midway Road
Cranston, RI 02920

Re: 49114444, Mary Lee Capalbo, Esq., Special Client Account

Please send the following $200,000.00 wires transfer today:

$100,000.00 to Chase Manhattan Bank, New York
ABA 021-000-021
UID Number 018451
For Account of UNION BANCAIRE PRIVEE
96-98 rue du Rhone, Geneva, Switzerland
Account Number: 001.1.821865
For further credit to: 239996 MH

- AND -

$100,000.00 to Chase Manhattan Bank, New York
ABA 021-000-021
UID Number 018451
For Account of UNION BANCAIRE PRIVEE
96-98 rue du Rhone, Geneva, Switzerland
Account Number: 001.1.821865
For further credit to: 239997 AB

Yours truly,

Mary Lee Capalbo, Esq.

Approved by
Branch manager
SEI

CONFIDENTIAL

SEC-56I 1085

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
vs. C.A. No. 02-154 ML
DENNIS S. HERULA,
Defendants,
AND
DAVID L. ULLOM,
Relief Defendant.
(Full caption continued on page two)

DEPOSITION OF CHARLES SULLIVAN
Tuesday, July 1, 2003
10:10 a.m.
United States Attorney's Office
50 Kennedy Plaza
Providence, Rhode Island
---------- Ellen Zappia, RPR ----------
Capitol Court Reporting, Inc.
225 Reservoir Avenue
Providence, Rhode Island 02907
(401) 453-1005

A. Yes. I produced these documents in response to the subpoena for the first -- that was part of the first round of production.

**Q. And these are promissory notes -- actually, tell me what these documents are.**

A. Yeah. They're promissory notes. This is -- this relates to the loans of 50,000 and 300,000 that I testified to earlier.

**Q. And these were loans to you personally, is that right?**

A. Yes. I think I testified this morning, I didn't remember whether they were to me or to Commonwealth, but I see they're to me.

**Q. And why did -- was there a reason you took these loans out?**

A. Yes.

**Q. What was that reason?**

A. I took out the $50,000 loan for working capital for Commonwealth and I took out the $300,000 to make an investment in Europe.

**Q. And did the investment in Europe have anything to do with your -- Brite Business or Commonwealth activities?**

A. No, it didn't.



**Q. Have you paid these loans back?**

A. No, I have not.

**Q. And it was Mr. Fife that loaned you the money under these notes, is that right?**

A. That's correct.

**Q. And has Mr. Fife asked you for these funds back?**

A. Yes, he has.

**Q. On what occasions? How many times?**

A. On several occasions.

**Q. Have you received any other loans from Mr. Fife other than those reflected in these promissory notes?**

A. No.

**Q. Have you received any -- have you or Commonwealth received any loans from -- any other loans other than this one from Brite Business?**

A. No.

MR. ZAKARIN: Luke, you understand, that loan -- those loans are from Fife to Sullivan, but you realize that there are -- and I think you said it right, any other loans from Brite -- that there are corresponding loans from -- in effect, from Brite to Fife.



MR. CADIGAN: Yes.

MR. ZAKARIN: Because there's no dispute that that money is Brite's money.

MR. CADIGAN: Thank you. And it's understood.

THE WITNESS: Could I talk with my counsel?

MR. CADIGAN: Sure.

MR. MACADAMS: Let's go outside.

(An attorney/witness conference was taken.)

**Q. Before we leave the -- although the notes were executed by you personally, the money was transferred to Commonwealth Management, isn't that right?**

A. That is correct.

**Q. In both cases for the 50,000 and the --**

A. That is correct.

**Q. Next I want to show you what we are marking as Exhibit 131.**

A. Yes.

(Letter, dated May 25, 2000, was marked Exhibit 131 for identification)

**Q. It's a May 25th, 2000 letter dated --**



**Bates-stamped CWS 757.**

A. Yes.

**Q. Do you recognize this document?**

A. Yes, I do.

**Q. And that's your signature at the bottom, is that right?**

A. Yes.

**Q. And what is this document?**

A. This is a document that relates to what I testified to before lunch concerning the exit of Trigon from -- the repayment of the Trigon loan.

**Q. Do you know who solicited the funds from Trigon?**

A. I do not.

**Q. And again I think you testified that you don't know what the arrangement was with Trigon -- between Trigon and Brite Business, is that right --**

A. I do not.

**Q. -- with respect to those loans.**

**When did you first learn that Trigon had provided funds to Brite Business?**

A. I don't remember.

**Q. Did you have any discussions with Mr. Hertzog regarding the funds provided by Trigon?**