UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SECURITIES AND EXCHANGE COMMISSION

v. C.A. No. 02- 154 ML

DENNIS S. HERULA, et al

**DEFENDANT CHARLES SULLIVAN'S OPPOSITION TO THE COMMISSION'S MOTION IN LIMINE**

Charles W. Sullivan
675 Third Avenue, 23 FL.
New York, NY 10017
(212) 983-3047
Pro se

Dated: July 24, 2006

[signature]

Defendant Charles W. Sullivan ("Sullivan") submits his opposition to the Motion of the Securities Exchange Commission (The "Commission") ***In Limine***.

***State of the Case:***

In April of 2002, the Commission filed a Complaint in this District against nine defendants relating to the activities of Brite Business Corp, ("Brite") a Delaware corporation which had been owned by Johan Hertzog, one of the Defendants named in the case. Brite has been dissolved. The Complaint alleged various violations of the securities laws relating to Brite's unsuccessful efforts to organize a trading program in which those who participated hoped to realize higher than market rate returns. Three of the companies who put up funds were repaid shortly after they requested a return of their funds. (Those companies were Trigon, Beehive and Four Star). One company, Rheaume Holdings, Ltd. was substantially repaid as the result of an Administrative proceeding against Raymond James Financial Services ("RJFS"). On the funding side there is only one party left, Mr. Al Bloushi who put up $7,500,000 as to which only $200,000 has been returned.

On the Defendant side there is also only one party left, Defendant Sullivan who was named in the Complaint as a purported aider and abettor of securities laws violations by certain of the other Defendants. Sullivan has denied any violation of the securities laws whatsoever. The Commission has settled with Defendants The Estate of Martin Fife, Farouk Khan, and David Ullom. In each of those cases, the Commission waived any civil penalty. Even though Defendant Ullom was only named as a relief Defendant, he was a major character in bringing about what went wrong here as the expediter for Defendant Herula. Herula was the rogue broker who misappropriated funds in the RJFS accounts on

which he was the account executive. None of the other Defendants other than Ullom received monies from Herula. While Sullivan had no involvement whatsoever in the raising of the funds from any of the lenders, the Commission is still, inexplicably, pressing for a civil penalty as to Sullivan. The Court has entered default judgments and civil penalties against the other defendants. The case is presently scheduled for trial on the Court's August calendar.

A. ***Commission's Efforts to Withhold Prior Payment Information from the Jury***

In its ***In Limine*** Motion, the Commission is asking this Court to withhold from the jury clearly material information as to the return of funds to the various lenders by Sullivan and others. While the Commission in general through its able public relations emissaries holds itself out to the nation and yes, even the world, as the champion of full disclosure, when a party with whom the Commission disagrees urges full disclosure the Commission tries to quickly slam the door in the face of any such party. In this case the unlucky slamee is Sullivan.

B. ***Commission's Efforts To Withhold Sullivan's Military Record From The Jury***

At the outset of the case, the Commission issued a press release in which the Commission sought to garner press attention to itself by reference to Sullivan's ties to the New England Patriots Football Club, the Foxboro, Mass based NFL franchise started by Sullivan's beloved father Billy Sullivan. The Commission staff then saved journalists the trouble of having to hunt for documents concerning the case in the Court files by forwarding copies of various documents to journalists directly. Out of a concern that the Commission's actions both in its initial release and in acting as the voluntary media service bureau to win favorable coverage for itself had tainted the jury pool, Sullivan

proposed to offer into evidence his actual commission from the President of the United States in the United States Army, the Meritorious Service Medal he received from former Secretary of the Army Stanley Resor, a letter of commendation from a General of the Army who had supervised Sullivan's work on behalf of our nation in Thailand, a drawing of Sullivan with complimentary captions that had appeared in the Boston Herald and the program from the First Super Bowl for which Sullivan was a contributing editor representing the former American Football League. Again, the Commission is seeking to slam the door on Sullivan and deny the jury its right to have evidence that contradicts the demeaning picture of Sullivan the Commission has portrayed through the media.

This memorandum will endeavor to discuss where things stand today as to each of the parties and why this Court should deny the Commission's ill founded Motion ***In Limine*** as to each party.

***1. Rheaume Holdings, Ltd.***

The Commission is seeking to withhold from our jury the fact that approximately seven million has been paid by RJFS to a fund for the benefit of two of those parties for its failure to supervise its former broker, Defendant Herula. In fact, it is amazing that the Commission wants to urge our jury to hold Sullivan responsible for the Rheaume transaction even though at no time did Sullivan have even one conversation on the telephone or in person with any of the Rheaume executives nor did Sullivan send even one piece of correspondence to any Rheamue executive. The Commission notes in its brief here that Rheaume and another party have not yet received their money. In fact, RJFS has paid out the money and any appeal periods relating to the administrative judge's decision have expired so Rheaume's receipt of its funds is without question.

In the case of Rheaume, it is also a matter of public record that Rheaume brought its own action against various defendants here concerning its loan of funds to Brite. It is also a matter of public record that Charles Sullivan was not named as a Defendant in that proceeding. A copy of the first page of the Complaint containing the case caption is attached as Exhibit A to this memorandum. Even though these facts are quite clearly exculpatory as to any responsibility of Sullivan with respect to the Rheaume transaction, the Commission is objecting to the admission of the Rheaume Complaint into evidence both through this ill founded Motion ***In Limine*** and though an objection to the admission of the Complaint as a trial exhibit of the Plaintiff in this proceeding. It is also a fact that in an SEC administrative proceeding Rheaume's monetary claims were largely satisfied. The Commission by its motion ***In Limine*** not only seeks to exclude the Complaint in which Sullivan was not named but also excluded the evidence of Rheaume's monetary recovery. The Commission in its brief suggests that the relevance of the above only goes to the amount of a disgorgement and not to liability and therefore that such evidence should be withheld from the jury. The fact that monies thought to have gone south have been recovered is certainly quite probative on the issue of liability. And it defies logic to think that any reasonable juror would not consider it relevant to the liability issue that Rheaume a victim of the purported "scheme" in bringing a private suit did not consider Sullivan's truly peripheral involvement to have been significant enough to name him as a party Defendant.

2. ***Four Star***

Commonwealth Management which had dealing with Four Star is not a Defendant in this proceeding. This case is separate and apart from the other transactions involving Brite.

The claims of Four Star against Sullivan, and Commonwealth Management were settled in a separate civil proceeding. The Commission here wishes to reassert claims that were already settled. Evidence, however, is certainly probative when the claim at issue is conduct amounting to aiding and abetting a violation of the securities laws. Sullivan agreed not to pursue his meritorious claims against Four Star in an amount in excess of three million dollars and Four Star agreed not to pursue claims against Sullivan in the amount of approximately six hundred thousand dollars. The Commission with its current motion is seeking to reassert the settled claim for $600,000 while trying to hide the fact of Sullivan's claim for $3,000,000. This Court should not prevent the jurors from knowing that the affected parties in the Four Star transaction have settled this case.

3. ***Al Bloushi***

As to Al Bloushi, Sullivan caused $200,000 to be paid to Bloushi on August 30, 2000 but the Commission is seeking by this motion ***In Limine*** to prevent Sullivan from introducing evidence as to that payment in connection with a loan that Brite had made to Sullivan. That evidence however, is also probative not just as a credit relating to the Commission's prayer for disgorgement but on the critical issue of liability. The $200,000 was not a payment made after the filing of this lawsuit but was made almost six years ago. Whether the $200,000 is a credit against Sullivan's loan or a payment on account of sums due Bloushi, it is certainly probative as to liability that there was a substantial

payment to Bloushi in August of 2000. In fact, $300,000 was loaned to Sullivan on June 28, 2000. The $200,000 that Sullivan caused to be sent by wire transfer to Al Bloushi was accomplished on August 30, 2000 just a short two months later and long prior to the maturity date of the loan.

C. ***This Court Should Admit Evidence of Prior Payments and Releases.***

The Commission describes the aforementioned payments by Sullivan, payments made at Sullivan's request and release of claims against lenders by Sullivan and others as "after the fact." The Commission asks this Court to bar Sullivan from giving evidence as to these payments and release on the theory that while the payments may be relevant in the context of a credit as to funds to be disgorged, the evidence of such payments should not be introduced to the jury on the issue of liability. The Commission's argument overlooks a critical fact. If the jury is made aware of the fact that just two months after a loan of $300,000 was made purportedly from Al Bloushi's funds, $200,000 was sent to Bloushi, it certainly would demonstrate that the ***scienter*** requirement in establishing a Rule 10b-5 violation would not be present. Demonstrating to the jury that there was a payment within two months of $200,000 when the loan amounted to $300,000 would certainly indicate that the elements of ***scienter*** that we have all come to know are simply not present in this case. Thus we would never ever even get to the issue of disgorgement. No liability exists.

As to the evidence relating to the administrative proceedings and the determination that Raymond James was responsible for the payment of $7 million to parties who had advanced monies to Brite, the Commission is also asking that such evidence be excluded. The Commission's argument on that point is also wide of the

mark. It is clearly probative as to the question of Sullivan's liability that the Commission itself in formal papers filed before a SEC administrative judge listed only three parties who had not been compensated in the aftermath of the Brite related transactions. Those three parties were: Rashed Mohamed Mahran Al Bloushi, Rheaume Holdings Ltd. and Malcom Monlezun. The Commission in its list of witnesses for the administrative proceeding only list those three parties as purported "investors." Robert Fitzhenry is listed as he is the owner of Rheaume Holdings Ltd. as well as Robert Curl his financial advisor. The Commission's list is attached as Exhibit B to this memorandum. In that proceeding, the administrative judge held that "Although Herula also made misrepresentations to a third investor, Rashed Al Bloushi ("Al Bloushi"), the Commission found that RJFS could not be held liable for these misrepresentations because Al Bloushi did not rely on them when first making his investment…" See Proposed Distribution Plan page 3, Exhibit C to this memorandum. In addition, in a letter to Mr. Cadigan and Mr. Ali concerning the administrative proceeding, Mr. Ali stated that he relied on "the belief that I was fully protected by a large financial company RJFS who were managing Brite Business funds including my funds and other's funds." See Exhibit D to this memorandum. Sullivan was in the exact same position as RJFS in that he also made no representations to Al Bloushi at the time he made his decision to loan funds to the Brite company organized under the laws of the British Virgin Islands. Sullivan was not there and had no conversations with Al Bloushi whatsoever. It is certainly strongly probative to Sullivan's defense on the liability issue that an administrative judge of the SEC refused to find Raymond James responsible for the loss of Al Bloushi's funds when that firm had no involvement with the original funding transaction. The evidence of that

prior decision is certainly evidence that should be presented to the jury as the exact same defense is applicable to Sullivan.

D. ***The Commission's Precedents Do not Support Suppression of the Evidence.***

The Commission states at page 3 of its brief that evidence of post-conduct payments should not be introduced to the jury because the Court rather than the jury will determine what relief should issue. But ***Tull*** and the other cases cited by the Commission only give support to the precedent that Courts determine the amount of a civil penalty if a penalty is warranted. None of those cases support the argument that a jury may not consider settlements or payments by defendants in their assessment of liability. The Commission's brief is based upon the mistaken assumption that liability has already been found to exist. That is just not the case. The jury should have a complete picture of what occurred and part of that complete picture includes the repayment at Sullivan's direction of $200,000 in the Al Bloushi transaction, the fact that Rheaume did not name Sullivan as a Defendant in its litigation and the fact that the Four Star case was settled. It is certainly not a fair or reasonable proposition that an agency of the United States government and particularly the Securities and Exchange Commission should attempt to withhold from a jury very material evidence indicating a significant repayment of funds that were advanced to the Brite entities and are clearly exculpatory as to any liability on the part of Sullivan.

The Commission places reliance in its brief on ***SEC v. First Jersey Securities,*** Inc.101 F.3D 1450 (2d Cir. 1996). (See page 2 of the SEC brief). This reliance is badly misplaced. It is not a case of apples being inappropriately compared to oranges. It is more

akin to apples being inappropriately compared to oysters. That case involved the saga of Robert Brennan, the penny stock king who carried out a massive advertising campaign flying around in a Bell Jet helicopter. He had 32 branch offices in the United States and 36 overseas and had more than 500,000 retail customer accounts for which he purchased and sold securities traded in public markets. Brennan owned 100% of the shares of First Jersey Securities Inc. In the current case pending before this Court Sullivan had no equity interest in either the Brite company incorporated in Delaware or the Brite company incorporated in the British Virgin Islands. There were no purchases or sales of public securities involved in this case and there are not 500,000 people affected but only one, Mr. Al Bloushi and Sullivan has no helicopter, just his Metrocard.

Nor does this case even stands for the proposition the Commission attributes to it. In fact, the Second Circuit stated: "It was well within the Court's discretion to give defendants credit for the $ 5 million paid out..." See SEC v. First Jersey Securities, Inc., ***supra*** at page 1475.

Rule 403 of the Federal Rules of Evidence states that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence". ***USCS Fed rules Evid R 403.*** In this case, the probative value of the evidence that Sullivan seeks to offer is directly related to his defense that there has been no violation of the securities laws by Sullivan.

In ***Securities and Exchange Commission v. Gilboa Peretz,*** 317 F. Supp. 58(D. Mass 2004) Judge Patti B. Saris in ruling in favor of a pro se Defendant in a case brought

by the Commission ruled that since the defendant did not have knowledge of the fraud the ***scienter*** requisite for liability as an aider and abettor was not present. If what Hertzog represented to Al Bloushi amounted to securities fraud, Sullivan was unaware of the fraud and took no action to induce Bloushi to part with his funds. Judge Saris also pointed out that ***Cleary v Perfectune*** 700 F 2d 774 (1st Cir 1983) requires that a defendant should be held liable as an aider and abettor only if the plaintiff proves that the defendant had actual knowledge of the improper activity of the primary violator and of his role in that activity.

This case has been open for more than four years and the Commission has not come forward with any evidence that Sullivan had actual knowledge as to any representation that caused Al Bloushi to loan funds to Brite.

The Commission also says that Sullivan will have a problem at trial in getting the Settlement information into evidence because of Rule 408 of the Federal Rules of Evidence. Rule 408 only bars evidence as to any offers of compromise by Sullivan to the Commission or the Commission to Sullivan, and Sullivan is not seeking to introduce either.

For the reasons herein stated, the Commission's ill founded motion ***In Limine*** should be denied.

Dated: July 24, 2006

New York, NY

Charles W. Sullivan
675 Third Avenue, 23 FL.
New York, NY 10017
(212) 983-3047
Pro se

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

RECEIVED

SEP 12 2002

U.S. District Court
District of Rhode Island

| | |
|---|---|
| RHEAUME HOLDINGS, LTD., Plaintiff | ) |
| v. | ) C.A. No. 02- |
| RAYMOND JAMES FINANCIAL SERVICES, INC., BRITE BUSINESS CORPORATION, MARTIN D. FIFE, DENNIS HERULA, SEA VIEW DEVELOPMENT AND HOLDINGS, LTD., MARY LEE CAPALBO, DAVID L. ULLOM Defendants | ) CA 02 400 ML |

## COMPLAINT

### INTRODUCTION

Two and one-half years ago, the Plaintiff invested $12.5 million in a trading account at the Raymond James Financial Services branch located in Cranston, Rhode Island. The account was in the name of Brite Business. Almost immediately after that transfer was complete, the designated registered representative of the Brite Business account at Raymond James Financial Services – with the acquiescence of his supervisor at that branch –together with his wife and the principal of Brite Business engaged in a concerted effort to defraud and mislead the Plaintiff, through a web of lies whose only purpose was to divert, dissipate, and otherwise misappropriate the Plaintiff's investment funds for their own personal gain.

Exhibit A

Rashed [redacted]ohamed Mehran Al [redacted]oushi
P O Box 43858 Abu Dhabi, Tel: +971506428383 Fax: +97126763610 Email: mbhamad@eim.ae

April 9, 2006

U-5

Att: Mr. Luke Cadigan
Att: Mr. Ali, Bradford

File # 311692

**Subject: Objection against the SEC proposed distribution plan for the RJFS funds**

By this I would like to submit to the esteemed SEC my objection against the proposed distribution plan of SEC for the RJFS funds between only two individuals out of those harmed by RJFS and Brite Business jointly and individually including myself..

**Reasons of my objection are:**

1- First of all I would like to state a fact to the esteemed SEC that Mr. Herula of RJFS was an official staff of RJFS acting as their Investment/Financial manager. That fact was proved by RJFS themselves during the proceedings of Brite Business case. He, Mr. Herula, was only terminated by RJFS after the case of Brite Business was filed and became Known to the public and thus after all the commitments given to me by him, Mr. Herula, on behalf of RJFS. Therefore, and since I did not know Mr. Herula or never had met him and until today, I considered all the correspondences received by me from Mr. Herula as an official communications with RJFS. I was not communicating with Mr. Herula on his personal capacity, but as RJFS manager. Simply RJFS as a company means nothing without the staff, and communication with any company is done only with its staff. Therefore all the official (not personal) staff actions are considered to represent the company, and that what exactly happened to me with RJFS.

2- RJFS misrepresented and mislead me when I asked them about Mr. Herula, when he disappeared and stopped communications with me, and the legal department of RJFS responded to me that there is no official with RJFS in that name. At that time the case had started and RJFS were in the mid of investigations by SEC. Then during the course of the proceedings, RJFS confessed that Mr. Herula was one of RJFS managers. RJFS mislead me and tried to keep me away from what was going on. Should RJFS had told me the truth, I should had taken all the necessary legal actions to get my funds transferred back to me at a time the funds were still kept with RJFS.

3- As I mentioned in my deposition, and again I repeat, that the name of RJFS was mentioned to me by Brite Business right from the beginning and that let me check their web site and get confident of the investment program and rely on the belief that I was fully protected by a large financial company RJFS who were managing Brite Business funds including my funds and other's funds. Please check my deposition and Mr. Hamad deposition this respect.

4- My belief that RJFS were behind the deal proved to be correct when that belief was confirmed by the official contact I had got directly from RJFS through their financial manager Mr. Herula who confirmed to me by an official fax letter, on RJFS letterhead, that our funds were under his and RJFS custody and they, Herula and RJFS, were both fully responsible of my funds individually and collectively. Please check the fax messages sent to me by RJFS.

5- It is true that RJFS did not ask me to transfer my funds to Brite Business account opened with them, like what they did with the other investors, but that was simply because my funds were already there deposited with them, RJFS, by Brite Business. Actually my funds, with some other's, enabled Brite Business to open the account with RJFS and thus enabled RJFS, with their, (RJFS), knowledge of the source of funds, to buy the I-Treasury Bills later, as a pre-step, for what they called the leveraging of funds to get the maximum profits for the

 Exhibit B

investors, including myself, and that what Mr. Herula conveyed to me in his fax messages on behalf of his employer RJFS.

6- RJFS were aware of my full name, my address, (where Mr. Herula sent me the faxes and wrote my full name), my participation in the program, and the amount of funds I had deposited with Brite Business which formed an important part of the funds of Brite Business used by RJFS to buy the I-Treasury Bills, RJFS being aware of all that they did not disclose any violations or risk to me, but on the contrary they encouraged me to continue and keep my funds to get the promised profits of the treasury. They actually betrayed me, harmed me, used me, humiliated me, and misrepresented me. Please check the fax messages of RJFS to me sent through their Investment/Financial manager Mr. Herula which proofs their knowledge and details of my participation on their program..

7- Based onto my funds, being deposited by Brite Business at a RJFS account, RJFS were begging the others to expedite their transfers to complete their portfolio to U$D 100 block as they called it then. That was why RJFS were calling others to send their funds and not calling on me to do the same since they were controlling my funds and they knew I could not had withdrawn the funds without their consent.

8- So, RJFS were not in touch with me at the beginning, not because they did not know me or did not want to misrepresent me or get my funds, but it was simply because my funds were already with them and they used them as an available seeds to attract others. When others delay their transfers to RJFS, then RJFS started calling on me to assure me that my funds were secured and I had to wait for the profits, all that was meant to keep me on the run until they, RJFS, collect more funds from the others, the one's you decided to compensate. I was not only harmed and exploited, but also hooked and humiliated. Don't we consider all that harm?

9- Thus, it looks very strange and unfair to compensate only those two investors who were attracted by my funds, which were kept with RJFS, and not to compensate me who was used as a vehicle to get others. RJFS behavior with me was not only harmful, misrepresentation, and exploitation, but also humiliation and cheating.

10- When RJFS felt that I was serious on calling on them to get my funds back, please check my repeated faxes to them and Brite Business, they, RJFS, started communicating with me to keep the funds until they get the other funds from the new investors. They kept sending me fax messages, Mr. Herula, to keep me in the run and use my funds and my name as a reference to get the others.

11- I would not had stopped asking for my funds to be sent back to me without the firm undertaking from RJFS, Mr. Herula, that my funds were save and under Mr. Herula own responsibility and RJFS responsibility respectively and jointly. Please check his fax messages to me.

12- SEC have catered to create a fair fund to benefit only two investors from those who were harmed by RJFS, this is by itself is not a fair sharing since the other investors had suffered even more than the selected two, who only sent their money at a time I was bleeding to RJFS to send back my funds and they refused to do that. Why did they refuse to send back my funds or even protect me? Can't we call that misrepresentation and harm?

13- If RJFS did not have knowledge right from the beginning about my funds deposited with them by Brite Business, then why they, RJFS, had kept my funds with them and kept asking me to wait and keep my funds with them for more time to get the expected treasury profits. Why shouldn't they, RJFS, advised me that the deal was risky and Brite Business can not fulfill the deal? Why shouldn't they, RJFS, sent back my funds being fully aware of my name, address, and the amount of my participation? Don't all this make them liable and condemned towards such an attitude towards me?

14- Sharing, by all means, should not deprive some investors against others who came to ride the boat late, not because of anything, but because RJFS had used my name as a reference to get them in that drowning boat.

15- If we consider the RJFS deal as a boat which gathered every body, so if the boat drown, should SEC safe only the last riders and leave those who suffered for long, or safe all of them equally if not giving priory to the pioneers who suffered more.

16- Although, in my opinion, I think I was the most harmed person by both RJFS and Brite Business, but still I would at least vote and ask for equality, and in proportionate, between the three investors, the selected two and myself. In my opinion, this will be the least just.

17- RJFS were fully indulged in the business of Brite Business and their clients including myself. RJFS were in full knowledge, details, coordination, collaboration, and financial deals with Brite Business. They were partners and had caused the same harm caused by Brite Business to all the participants of the offered High Yield Program.

By this submission I request the esteemed SEC to revise the proposed plan for the distribution of RJFS funds, even they are little, and consider me as one of the most harmed investors by RJFS.

Looking forward to receive the respected decision of the SEC with my thanks and whole heart full profound respect and appreciation for all the efforts, dedication, and professional lead the respected staff of the SEC have done in this case, with my very best regards and respect to all of you.

(Please accept this email as an official document issued by myself, original signed copy will follow by mail to the Office of the Secretary, United States Securities and Exchange Commission, 100 F Street, NE, Washington, DC 549-1090)

Rashed Mohamed Mehran Al Bloushi
P O Box 43858 Abu Dhabi, U. A. E.
Tel: 00971-50-642 83 83
Fax : 00971-2-676 36 10
Courier address:
Pent House 172, 17th floor,
Bin Ham Blg., Hamdan St.,
Abu Dhabi, United Arab Emirates

<u>Quotes from the SEC proposed distribution plan for RJFS fund:</u>

"Although Herula also made misrepresentations to a third investor, Rashed Al Bloushi ("Al Bloushi"), the Commission found that RJFS could not be held liable for these misrepresentations because Al Bloushi did not rely on them when first making his investment, and it stated that it would "create a Fair Fund to benefit Mr. Fitzhenry and Mr. Monlezun, the investors harmed by the violations."

"The Distribution Plan generally provides for the distribution to Robert Fitzhenry and Malcolm Monlezun, the two individuals that were found to have been harmed by RJFS's securities violations."

T-5

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

| | | |
|---|---|---|
| In the Matter of<br><br>RAYMOND JAMES FINANCIAL SERVICES, INC., J. STEPHEN PUTNAM and DAVID LEE ULLOM,<br><br>Respondents. | : | Administrative Proceeding<br>File No. 3-11692 |

**THE DIVISION OF ENFORCEMENT'S LISTS OF WITNESSES AND EXHIBITS**

Pursuant to Rule 222 of the Commission's Rules of Practice, the Division of Enforcement (the "Division") hereby submits the following lists of witnesses and exhibits:[1]

## I. Witnesses

The Division expects to call the following witnesses at trial:[2]

1. Rashed Mohamed Mehran Al Bloushi
   Investor
   P.O. Box 43858
   Abu Dhabi, United Arab Emirates
   (By videotaped deposition)

Rashed Mohamed Mehran Al Bloushi will testify as to the circumstances surrounding his $7.5 million investment with Brite Business. He will also testify that he

[1] By agreement of the parties, the Division reserves the right to supplement and amend these lists as necessary in preparation of its case and anticipation of the subsequent exchange of marked exhibits. The Division further reserves the right to call additional witnesses and seek introduction of additional exhibits in rebuttal if necessary.

[2] The Division notes that depending upon the stipulations it reaches with the respondents and the testimony it elicits at the hearing, it may not need to call every witness on its list.

Exhibit C

has yet to receive back the $7.5 million he invested, much less any return on that investment.

2. Barry S. Augenbraun, Esq.
Senior Vice President and Corporate Secretary
Raymond James Financial, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33176

Barry Augenbraun is expected to testify concerning his responsibilities as Senior Vice President and Corporate Secretary of Raymond James Financial, Inc., the organization of Raymond James, and red flags raised with respect to Herula, including a proposed transactions relating to Brite Business, Herula, and Ullom and complaints relating to Herula.

3. John Bowman
Assistant Vice President
Raymond James Financial Services, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33716

John Bowman, an assistant vice president at Raymond James Financial Services, Inc. ("RJFS") with compliance responsibilities, is expected to testify concerning the restriction placed on the Brite Business account and the review of account surveillance reports.

4. Kevin Carreno
Former Senior Vice President and Chief Compliance Officer
Raymond James Financial Services, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33716

Kevin Carreno is expected to testify concerning his role as head of compliance for RJFS and the supervisory policies and procedures that applied to Herula as a RJFS registered representative.

5. Robert Curl
Financial Adviser to Robert Fitzhenry
Presidential Suites, Number 11
Flamingo, Costa Rica

Robert Curl, Robert Fitzhenry's financial adviser, who handled the $12.5 million investment by Rheaume Holdings Ltd. with Brite Business, is expected to testify concerning the circumstances of the investment, including representations made by Herula as a RJFS representative about the safety of Rheaume's investment and the location of the funds invested. In addition to representations that Herula made in

correspondence drafted on RJFS letterhead, Curl is expected to testify concerning the verbal representations Herula made when Curl traveled to the Cranston branch of RJFS to investigate the proposed investment.

6. Michael DiGirolamo
Senior Vice President and Chief Compliance Officer
Raymond James Financial Services, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33716

Michael DiGirolamo is expected to testify concerning his role as head of compliance for RJFS and the supervisory policies and procedures that applied to Herula as an RJFS registered representative.

7. Martin D. Fife
Former President of Brite Business
(Designation of prior sworn testimony)

Pursuant to Rule 235(a)(1) of the Commission's Rules of Practice, the Division intends to designate brief passages of the prior sworn testimony of Defendant Martin D. Fife, now deceased, the former President of Brite Business, to explain aspects of the transfer of funds into and out of the Brite Business account at RJFS.

8. Robert Fitzhenry
Investor
Dar Es Salaam
Cooper Hill
St. James, Barbados

Robert Fitzhenry is expected to testify that in March 2000, he invested $12.5 million with Brite Business through his company, Rheaume Holdings, Ltd. In connection with this investment, Fitzhenry will testify that Herula made representations as a RJFS representative as to the safety of the investment and that after receiving these representations, Fitzhenry transferred $12.5 million to the Brite Business account at RJFS. Fitzhenry will further testify that Rheaume has not received any of the returns it had been promised on the investment, nor has it received back any of its principal.

9. Mark Gera
Branch Chief
U.S. Securities and Exchange Commission
73 Tremont Street, 6th Floor
Boston, Massachusetts 02108

Mark Gera is expected to testify concerning the Commission's examination of the Cranston Branch of RJFS.

10. George L. Guerra, Esq.
(Former Vice President and Associate Corporate Counsel)
GrayRobinson
201 North Franklin Street, Suite 2200
Post Office Box 3324
Tampa, FL 33602

George L. Guerra, Esq. is expected to testify concerning the complaint sent to RJFS by Mohamad Hamad regarding Mr. Bloushi's investment.

11. M.B. Hamad
(Advisor to Rashed Bloushi on Brite Business investment)
General Manager, Adceco Group
P.O. Box 43858
Abu Dhabi, UAE
(By videotaped deposition)

M.B. Hamad, who handled the Brite Business investment for Bloushi, will testify as to the communications he had with Herula concerning Bloushi's investment and the representations Herula made on behalf of RJFS in those communications.

12. Dennis S. Herula
Former Raymond James Registered Representative
Englewood FDC
9595 W. Quincy Avenue
Littleton, CO 80123
(Live or by deposition)[3]

Dennis Herula is expected to testify about the circumstances surrounding the fraud he committed while acting as a RJFS registered representative in connection with the Brite Business scheme, and to which he has already pled guilty in a separate criminal matter.

13. Thomas James
President and Chief Executive Officer of Raymond James
Raymond James Financial, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33176

Thomas James, President and Chief Executive Officer of Raymond James Financial, Inc., is expected to testify concerning his awareness of and reaction to a proposed transaction with Brite Business.

---

[3] The Division is awaiting word from the respondents as to whether they will agree that Mr. Herula's trial testimony may be preserved by video-taped deposition.

14. John C. Maynard
Vice President and Director of National Sales
Raymond James Trust Company
710 Carillon Parkway
St. Petersburg, Florida 33716

John Maynard is expected to testify concerning red flags raised with respect to Herula, including proposed transactions relating to Brite Business, Herula and Ullom and subsequent communications among executives of RJFS and its affiliates relating to Brite Business, Herula and Ullom.

15. Randy L. Miller
Internal Auditor
Raymond James Financial Services, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33716

Randy Miller a RJFS internal auditor is expected to testify concerning the 1999 audit of the Cranston branch of RJFS.

16. Malcolm Monlezun
Investor
4876 Champions Drive
Lake Charles, Louisiana

Malcolm Monlezun is expected to testify about the circumstances concerning the $1 million that he and his wife invested at RJFS in late 2000, including Mr. Monlezun's communications with Dennis Herula, who served as the RJFS account manager. Mr. Monlezun will also testify that approximately $875,000 of his investment has not yet been returned.

17. David Ness
President
Raymond James Trust Company
710 Carillon Parkway
St. Petersburg, Florida 33716

David Ness is expected to testify concerning red flags raised with respect to Herula, including proposed transactions relating to Brite Business, Herula and Ullom and subsequent communications among executives of RJFS and its affiliates relating to Brite Business, Herula and Ullom.

18. Corliss Primavera
Investigator
U.S. Securities and Exchange Commission
73 Tremont Street, 6th Floor
Boston, Massachusetts 02108

Corliss Primavera, a Commission investigator, is expected to testify as a summary witness concerning the flow of investor funds in and out of the relevant bank and brokerage accounts, including but not limited to the Brite Business account and the Capalbo account at RJFS.

19. Respondent J. Stephen Putnam
(Former President and Chief Operating Officer at RJFS)
Executive Vice President of Special Projects
Raymond James Financial, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33176

Respondent J. Stephen Putnam, President and COO of RJFS during the relevant period, is expected to testify concerning, *inter alia*, his dealings with Brite Business, Herula, and Ullom, including his concerns and skepticism regarding their activities; his awareness of correspondence that Herula had sent or was sending to potential Brite Business investors on behalf of RJFS; his approval of transfers from the Brite Business account at RJFS to an account controlled by Herula's wife; and the steps he took or failed to take in his supervision of Herula's activities.

20. Lara Thyagarajan, Esq.[4]
Counsel to RJFS
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

Lara Thyagarajan is expected to testify concerning representations made by her on behalf of RJFS concerning the supervisory policies and procedures that applied to Herula as an RJFS registered representative. She is also expected to testify about representations made as to RJFS's electronic mail retention policies, practices and procedures during the relevant period.

21. Respondent David Ullom
(Former Manager of Cranston Branch of RJFS)
270 Nicholas Road
Greene, RI 02827

[4] If the parties are able to reach an appropriate stipulation as to the representations made to the Division on behalf of Raymond James, the Division expects that it may not be necessary to call Ms. Thyagarajan as a witness.

Respondent David Ullom is expected to testify broadly concerning his responsibilities as branch manager of the Cranston, Rhode Island office of RJFS, the failure to supervise Herula, RJFS's supervisory policies and procedures, internal audits of the Cranston, RI office of RJFS, review of Herula's correspondence, oversight of work Herula performed outside of the office, transactions in RJFS accounts of Herula, Capalbo, Brite Business, Monlezun, and communications with Stephen Putnam and other executives of RJFS and its affiliates relating to Herula and Brite Business.

22. Thomas Wegner
Raymond James Financial Services, Inc.
880 Carillon Parkway
St. Petersburg, Florida 33716

Tom Wegner, a RJFS internal auditor, is expected to testify concerning the 2000 audit of the Cranston branch of RJFS

## II. Exhibits

The Division expects to offer as exhibits documents taken from the list of exhibits attached hereto as Exhibit A.

Respectfully submitted,

DIVISION OF ENFORCEMENT,
by its attorneys,

Luke T. Cadigan, Senior Trial Counsel
Ian D. Roffman, Senior Trial Counsel
Bradford Ali, Senior Counsel
Dawn Edick, Staff Attorney
U.S. Securities & Exchange Commission
73 Tremont Street, Suite 600
Boston, MA 02081
(617) 573-8919 (Cadigan)
(617) 424-5940 (Fax)

Dated: December 30, 2004

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 30, 2004, I served copies of the foregoing lists of witnesses and exhibits to each of the following by fax and first-class mail:

Honorable Brenda P. Murray, Chief Administrative Law Judge
Office of Administrative Law Judges
U.S. Securities and Exchange Commission (Stop 11-6)
450 5th Street, N.W., Room 10400
Washington, D.C. 20549-1106
Fax (202) 942-9655

**Counsel for Respondent Raymond James Financial Services, Inc.**
Burton W. Wiand, Esq.
Maya M. Wolfe, Esq.
Fowler White Boggs Banker
501 East Kennedy Boulevard
Tampa, FL 33602
Fax (813) 229-8313

Lara Thyagarajan, Esq.
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110
Fax (617) 439-9556

**Counsel for J. Stephen Putnam**
Jerry A. Isenberg, Esq.
Thomas J. McGonigle, Esq.
Lindi L. Beaudreault, Esq.
LeClair Ryan, A Professional Corporation
1701 Pennsylvania Avenue N.W., Suite 1045
Washington, D.C. 20006
Fax (202) 659-4130

**Counsel for Respondent David Lee Ullom**
Willis H. Riccio, Esq.
Paul Curcio, Esq.
Adler Pollock & Sheehan P.C.
2300 Financial Plaza
Providence, RI 02903
Fax (401) 751-0604

Luke T. Cadigan, Esq.

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

| | | |
|---|---|---|
| **In the Matter of**<br><br>**RAYMOND JAMES FINANCIAL SERVICES, INC., and J. STEPHEN PUTNAM,**<br><br>**Respondents.** | : | Administrative Proceeding<br>File No. 3-11692 |

**PROPOSED DISTRIBUTION PLAN**

Pursuant to Rule 1101 of the Securities and Exchange Commission's ("Commission") Rules of Practice, the Division of Enforcement ("Division") hereby submits its proposed plan (the "Plan") for the administration and distribution of funds in the Fair Fund created in this matter.

## I. Background

1. On November 21, 2005, after a hearing in this matter before Chief Administrative Law Judge Brenda P. Murray, the Commission found Respondent Raymond James Financial Services, Inc. ("RJFS") liable for fraud and found RJFS and Respondent J. Stephen Putnam ("Putnam") liable for failure to supervise. The Commission ordered RJFS to pay a penalty of $6,900,000.00, disgorgement of $5,866.25, and prejudgment interest of $1,866.76, for a total of $6,907,733.01. Putnam was ordered to pay a penalty of $200,000.00, but no disgorgement.

Exhibit D

2. RJFS satisfied its disgorgement, prejudgment interest and penalty obligations by paying $6,907,733.01 to the Commission on November 22, 2005 for inclusion in a Fair Fund, pursuant to Section 308(a) of the Sarbanes Oxley Act of 2002.[1] The funds, which were initially received by the Commission, have since been transferred to the Department of Treasury's Bureau of Public Debt ("BPD"). Pending distribution, the funds have been invested in short-term Treasury securities.

3. Rule of Practice 1101 requires the Division to submit a proposed plan for the administration and distribution of funds in a Fair Fund. The Division now submits its Plan for distributing the funds to defrauded investors.

## II. Definitions

As used herein, the following definitions shall apply:

1. "RJFS Fair Fund" shall mean the funds that RJFS has paid to the Commission in satisfaction of its disgorgement, prejudgment interest, and penalty obligations, plus the interest and income generated while the funds were held by the Commission or by BPD, less any fees, expenses, reserves, or taxes, if any, incurred in making the distribution.

2. "Claimants" shall mean the specific persons or entities who were harmed by RJFS's securities violations at issue in this matter, *i.e.*, by the fraud committed by RJFS through its registered representative, Dennis Herula ("Herula"), and by RJFS's failure to supervise Herula. The Commission found that Robert Fitzhenry, who invested

[1] Putnam satisfied his penalty obligation by paying $200,000 to the Commission on December 21, 2005. This payment, which included no disgorgement obligation, did not qualify for inclusion in the Fair Fund.

funds through Rheaume Holdings Ltd., and Malcolm Monlezun were the two individuals harmed by RJFS's securities violations.[2]

## III. Receipt of Additional Funds

The Division does not anticipate that other than the initial payment by RJFS there will be any additional funds paid into the RJFS Fair Fund.

## IV. Allocation of the RJFS Fair Fund

1. The funds in the RJFS Fair Fund shall be allocated between the two Claimants on a *pro rata* basis, based upon the ratio of (a) the amount that each investor lost by virtue of RJFS's conduct to (b) the total lost by both of the Claimants.

2. The record at trial showed that Mr. Fitzhenry and Mr. Monlezun lost a combined $10,874,065.70. Of this sum, Mr. Fitzhenry lost $10 million (or 91.96%) and Mr. Monlezun lost $874,065.70 (or 8.04%). The Division proposes that under the foregoing, the Claimants should receive the following distributions from the funds in the RJFS Fair Fund:

   a. Robert Fitzhenry: 91.96%

   b. Malcolm Monlezun: 8.04%

## V. Plan Comment Period

1. The Division shall mail a copy of this Plan to the Claimants within five (5) days of its filing. In addition, the Division shall seek to publish a notice of the Plan (the "Notice") in the SEC Docket and on the SEC Web site. Any person and/or entity

[2] Although Herula also made misrepresentations to a third investor, Rashed Al Bloushi ("Al Bloushi"), the Commission found that RJFS could not be held liable for these misrepresentations because Al Bloushi did not rely on them when first making his investment, and it stated that it would "create a Fair Fund to benefit Mr. Fitzhenry and Mr. Monlezun, the investors harmed by the violations."

wishing to comment on or object to this Plan may submit their views, in writing, no later than May 1, 2006:

a. to the Office of the Secretary, United States Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549-1090;

b. by using the Commission's Internet comment form (http://www.sec.gov/litigation/admin.shtml); or

c. by sending an e-mail to rule-comments@sec.gov. Please include File Number 3-11692 on the subject line.

2. The Division requests that after the expiration of the comment period set forth in the foregoing paragraph, the Commission issue an order approving the Distribution Plan, appointing the Fund Administrator, and authorizing the distribution of the RJFS Fair Fund in accordance with the terms of the Plan.

3. If for any reason monies from the RJFS Fair Fund are unclaimed after 60 days of the disbursement of funds to the Claimants, or if checks written by the Commission are returned by the Claimants, those funds shall be distributed to the United States Treasury.

**VI. <u>Appointment and Duties of the Fund Administrator</u>**

1. Due to the small number of Claimants, and to insure the maximum payout to these Claimants, the Division proposes that Luke T. Cadigan, a Senior Trial Counsel in the Boston District Office, be appointed as Fund Administrator of the RJFS Fair Fund.

2. The Fund Administrator shall carry out the duties specified by this Plan, including the following:

a. oversee compliance with the terms of the Plan;

b. use reasonable efforts to locate the current addresses of the Claimants and to obtain their tax identification numbers or Social Security numbers, if any;

c. monitor the engagement of Damasco and Associates, who was appointed as the separate tax administrator (the "Tax Administrator") for the RJFS Fair Fund by the Commission on February 23, 2006 pursuant to and in accordance with the Commission's "Omnibus Order Directing the Appointment of Tax Administrator in Administrative Proceedings that Establish Distribution Funds," Rel. No. 34-53279A ("Omnibus Order") dated February 14, 2006;

d. establish a reserve fund for future expenses, if any; and

e. submit the report specified in Paragraph 6 below.

3. In carrying out his duties, the Fund Administrator may be assisted by other Commission staff acting under his supervision.

4. The Tax Administrator shall keep records and bill the RJFS Fair Fund for the services provided to it and for the tax payments made on its behalf. Each bill shall be reviewed by the Fund Administrator. After the Fund Administrator has approved the bill for payment, the Commission will pay the bill using funds from the RJFS Fair Fund. Payment shall come first from any earnings or interest in the RJFS Fair Fund, and second, if necessary, from the principal of the RJFS Fair Fund.

5. Upon approval by the Commission of the distribution of the RJFS Fair Fund, and after all taxes and bills from the Tax Administrator have been paid and any reserve established, the Fund Administrator shall forward to the Commission's Office of Financial Management ("OFM") all the necessary information (including the names,

addresses, Social Security numbers, and taxpayer identification numbers, if any, of the two Claimants) for the payment of the distributions to the Claimants. In addition, the Fund Administrator shall transmit to OFM the amount from the RJFS Fair Fund that each Claimant is to receive. Upon submission of this payment information, the Commission will authorize OFM to distribute the funds to the Claimants.

6. Within 60 days after the distribution of the Fair Fund to the Claimants, the Fund Administrator shall be required to provide to the Commission, for its approval, a Final Accounting that gives an accounting of all monies earned or received and all monies spent in connection with the administration of the Plan, sets forth the distributions and payments made pursuant to the Plan, identifies any Claimants not located, describes the efforts made to locate such Claimants, and describes the Fund Administrator's performance of any other duties set forth herein. At that time, the Fund Administrator will also request the discharge of the Fund Administrator. Unless the Commission orders otherwise, the RJFS Fair Fund will terminate 30 days after the submission of the Fund Administrator's Final Accounting.

7. Other than the report specified in Paragraph 6 above, the Fund Administrator shall not be required to report or account to the Commission.

8. After the termination of the RJFS Fair Fund and the discharge of the Fund Administrator, OFM shall, upon the notification by the Fund Administrator, transfer any money remaining in the RJFS Fair Fund to the United States Treasury.

9. Pursuant to Rule 1105(d) of the Commission's Rules of Practice, 17 C.F.R. § 201.1105(d), the Fund Administrator shall receive no compensation, other than

his regular salary as an employee of the Commission, for his services in administering the RJFS Fair Fund.

10. The Fund Administrator shall be entitled to rely on any orders issued in this proceeding by the Commission, the Secretary by delegated authority, or an Administrative Law Judge, and may not be held liable to any person for any act or omission in the course of administering the RJFS Fair Fund, except upon a finding in this proceeding of willful failure to comply with the terms of the Plan or any orders issued in this proceeding. The Fund Administrator will be deemed to be acting within the scope of his employment with the Commission in administering this Proposed Plan.